UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,

      Plaintiff,

v.

VIRK PROPERTY SOLUTIONS LLC,
and WAHAB YOUSAF VIRK,

      Defendants.

_____

## COMPLAINT

Plaintiff MARK W. DOBRONSKI, appearing *in propria persona*, for his complaint against Defendants VIRK PROPERTY SOLUTIONS LLC and WAHAB YOUSAF VIRK, alleges as follows:

### NATURE OF ACTION

1. This is a consumer rights case under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227 *et seq.*, and the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101 *et seq.*, and the Michigan Telephone Company as Common Carriers Act ("MTCCCA"), M.C.L. § 484.101 *et seq.*, seeking statutory damages, treble damages for willful or knowing violations, injunctive relief, and costs.

2. This action arises from Defendants' repeated, unsolicited telephone

1

solicitations and SMS text message telemarketing calls to Plaintiff's telephone number using an automatic telephone dialing system ("ATDS") without prior express consent.

## PARTIES

3.     Plaintiff MARK W. DOBRONSKI is a natural person, a citizen of the United States, domiciled in Orange County, Florida, and maintaining a residence in Washtenaw County, Michigan.

4.     Defendant VIRK PROPERTY SOLUTIONS LLC ("VPS") is a limited liability company organized and existing under the laws of the State of Michigan, with its principal office located at 1600 Ferney Street, Dearborn, Michigan 48126-1602.

5.     Defendant WAHAB YOUSAF VIRK ("Virk") is a natural person, who resides at 1600 Ferney Street, Dearborn, Michigan 48126-1602.

6.     Upon information and belief, Virk is, and at all times relevant hereto was, the owner, member, manager, principal, and/or controlling person of VPS, and exercised day-to-day operational control over VPS's business activities, including its marketing and lead-generation activities.

7.     Upon information and belief, at all times relevant hereto, the persons who initiated the calls and text messages alleged herein, including the individual identifying himself as "Jason," were acting as agents, representatives, contractors, lead generators, and/or persons acting on behalf of VPS and Virk, within the course

and scope of that relationship, and for the direct benefit of VPS and Virk.

8.     Virk personally authorized, directed, controlled, ratified, and/or actively participated in the telemarketing campaign alleged herein, including by hiring or using third-party cold callers to generate seller leads, personally following up on the lead generated from Plaintiff, sending or causing to be sent a DocuSign contract, and sending or causing to be sent the follow-up SMS text messages alleged herein.

9.     By personally following up on the lead generated by "Jason," continuing the solicitation, sending or causing to be sent contract documents, and thereafter continuing text-message solicitations, Virk ratified and adopted the prior telemarketing acts undertaken on behalf of VPS and for his own benefit, and is individually liable in addition to VPS.

## JURISDICTION

10.     This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

11.     This Court has general personal jurisdiction over Defendant VPS, pursuant to M.C.L. § 600.711, as a result of the defendant: being organized under the laws of this state; and/or, carrying on of a continuous and systematic part of its general business within the state.

12.     This Court has general personal jurisdiction over Defendant Virk, pursuant to M.C.L. § 600.701, as a result of the individual being a resident and having domicile in the state.

3

## VENUE

13.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as the tortious or illegal telephone calls complained of herein were received by Plaintiff in this judicial district, to wit: at Plaintiff's residence in Washtenaw County, Michigan.

## PRELIMINARY STATEMENT

14.    As the Supreme Court recently explained, "Americans passionately disagree about many things.  But they are largely united in their disdain for robocalls." *Barr v. American Association of Political Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

15.    In response to widespread public outrage over intrusive telemarketing calls to homes and businesses, the United States Congress acted to prevent persons, like Defendants, from invading American citizens' privacy and to prevent abusive "robo-calls" by enacting the TCPA.

16.    Congress has found that interstate telemarketing fraud has become a problem of such magnitude that the resources of the Government are not sufficient to ensure adequate consumer protection from such fraud.

17.    As a result, Congress intentionally created a legally enforceable bounty system, not unlike *qui tam* statutes, to incentivize the assistance of aggrieved private citizens to act as "private attorneys general" in enforcing federal law.

### Telephone Consumer Protection Act

18.    In 1991, Congress enacted the TCPA to restrict the use of sophisticated

telemarketing equipment that could target millions of consumers *en masse.* Congress found that these calls were not only a nuisance and invasion of privacy to consumers specifically, but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3, 1991 U.S.C.C.A.N. 1968, 1969-71, 1991 WL 211220 (1991).

19. The TCPA imposes restrictions on the use of automated telephone equipment. 47 U.S.C. § 227(b)(1).

20. Pursuant to authority delegated by Congress to the FCC under the TCPA at 47 U.S.C. § 227(b)(2), the FCC has adopted regulations to implement the aforesaid restrictions on use of automated telephone equipment. The TCPA implementing regulations are promulgated at 47 C.F.R. § 64.1200(a) *et seq.*

21. As part of the restrictions on use of automated telephone equipment, Congress created a private right of action for aggrieved persons to receive $500.00 in damages for *each* violation of the subsection of the statute or the regulations prescribed thereunder, which amount the court may treble if the court finds that the defendant willfully or knowingly violated the statute or the regulations. 47 U.S.C. § 227(b)(3).

22. Additionally, the Congress also sought to protect subscriber privacy rights, and directed the FCC to initiate a rulemaking proceeding to compare and evaluate alternative methods and procedures, and to develop proposed regulations to implement the methods and procedures that the FCC determines are most efficient to accomplish the need to protect telephone subscribers' privacy rights to avoid

receiving telephone solicitations to which they object. 47 U.S.C. § 227(c)(1). The FCC conducted such a rulemaking and implemented regulations to protect telephone subscribers' privacy rights. See *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 FR 44144, 2003 WL 21713245 (July 25, 2003).

23.     As part of the protection of subscriber privacy rights, Congress created a private right of action for aggrieved persons to receive $500.00 in damages for *each* violation of the subsection of the statute or the regulations prescribed thereunder, which amount the court may treble if the court finds that the defendant willfully or knowingly violated the statute or the regulations. 47 U.S.C. § 227(c)(5).

### Michigan Home Solicitation Sales Act

24.     The Michigan Legislature has also enacted statutes governing and restricting telephone solicitors from making or causing to be made a telephone solicitation to a residential telephone subscriber.  The restrictions include a prohibition on telephone solicitations using in whole or in part a recorded message. M.C.L. § 445.111a(1).  A telephone solicitor shall not make a telephone solicitation to a residential telephone subscriber whose name and residential telephone number appears on the national do-not-call list.  M.C.L. § 445.111a(5).  Telephone solicitors must properly identify themselves and their organization.  M.C.L. § 445.111b(1) and (2).  Telephone solicitors may not block or otherwise interfere with the caller ID function of the telephone. M.C.L. § 445.111b(3).  Further, telephone solicitors may

not engage in specified unfair or deceptive acts or practices as set forth in the act. M.C.L. § 445.111c.

25.     The MHSSA provides that a person who suffers a loss as a result of violation of the MHSSA may bring an action to recover actual damages or $250.00, together with reasonable attorney fees.  M.C.L. § 445.111c(3).

## Michigan Telephone Companies as Common Carriers Act

26.     The Michigan Legislature has also enacted statutes prohibiting callers from using a telephone line to contact a telephone subscriber at the subscriber's residence, business, or toll-free telephone number for the purpose of presenting, delivering, or attempting to deliver commercial advertising except when the subscriber has voluntarily requested, consented, permitted, or authorized the contact from the caller.  M.C.L. § 484.125(2).

27.     An SMS text message used to transmit a precomposed commercial solicitation constitutes a "recorded message" within the meaning of M.C.L. § 484.125(2), because the message is reduced to fixed form before transmission, stored and sent by telephone equipment over a telephone line, and delivered to the subscriber in the same functional manner as any other prerecorded commercial communication. A text message is already recognized in telemarketing law as a form of telephone "call," and where, as here, the sender uses that call to deliver a fixed, prewritten commercial solicitation to the subscriber, the communication falls within the MTCCCA's prohibition on delivering commercial advertising by recorded

7

message.

28. The MTCCCA provides that a subscriber contacted by a caller in violation of the MTCCCA may bring an action to recover damages of $1,000.00, together with reasonable attorneys' fees. M.C.L. § 484.125(5).

**GENERAL ALLEGATIONS SPECIFIC TO THIS COMPLAINT**

29. Plaintiff maintains telephone number 734-***-**71 ("Plaintiff's Number").

30. Plaintiff's Number is assigned to a cellular telephone service and is therefore protected under the TCPA.

31. Plaintiff uses Plaintiff's Number primarily for personal, family, and household purposes, and not for business purposes.

32. Plaintiff's Number is listed on the National Do Not Call Registry and has been so listed continuously since at least December 9, 2004, thus giving notice to the World that Plaintiff does not wish to receive telemarketing calls at Plaintiff's Number.

33. Courts are legally bound to give great deference to the FCC's interpretations of the TCPA and its own regulations. See *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ... ").

34. The FCC has issued a declaratory ruling defining "called party" as "the

subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." *In the Matter of Rules & Regulations Implementing the TCPA*, CG Docket No. 02–278, WC Docket No. 07–135, FCC 15–72, 2015 WL 4387780, at *26 ¶ 73 (2015).

35.     Plaintiff is the customary user of the called telephone line, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered the nuisance and invasion of privacy of same.  Thus, Plaintiff has standing to bring this action for alleged violations of TCPA's provisions.  *See Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 324 (3rd Cir., 2015).

36.     The FCC has ruled that wireless subscribers who ask to be put on the national do-not-call list are presumed to be "residential subscribers." *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14039, 2003 WL 21517853, at *14, ¶ 36 (2003).

37.     It is undisputed that a text message constitutes a call for the purposes of the Telephone Consumer Protection Act. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 874 (9th Cir. 2014), *aff'd*, 577 U.S. 153, 156, 136 S. Ct. 663, 667 (2016).

38.     At no time relevant hereto has Plaintiff or any other authorized person requested, consented, permitted, or authorized the contact from the Defendants.

39.     At no time has Plaintiff provided permission to the Defendants to engage in telephone solicitation with the Plaintiff via telephone.

40.     At no time has Plaintiff provided "prior express consent" or "prior express written consent" (as those terms are defined under the TCPA and as interpreted by the FCC) for the Defendant or anyone acting on behalf of the Defendant to initiate any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to Plaintiff's cellular telephone number.

41.     At no time has Plaintiff had an "established business relationship" (as that term is defined under the TCPA and as interpreted by the FCC) with the Defendants.

42.     The FCC has declared that a necessary element for a person to provide "consent" is that the person must knowingly and voluntarily provide the telephone number at which they are authorizing telemarketing calls to be received at.  For example, capturing a caller's telephone number by a Caller ID or ANI device cannot be considered consent to receive telemarketing calls. *In re Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 8769, 1992 WL 690928, at *11, ¶ 31 (1992).

43.     The FCC has further declared that persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, if the caller is making calls within the scope of the consent given, and absent instructions to the contrary.  *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8028, 2015 WL 4387780, at *47, ¶ 141

10

(2015).

44.     Similarly, for purposes of an "established business relationship," the FCC has declared that a consumer inquiry cannot be considered to create a business relationship where the consumer's number has been captured absent that consumer's express invitation or permission to be contacted at the captured number. *In re Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 8771, 1992 WL 690928, at *13, n. 67 (1992).

45.     At no time has Plaintiff released his phone number to any of the Defendants in order to have given invitation or permission to be called at that number.

46.     Consent cannot be "presumed." The TCPA and the Commission's rules plainly require express consent, not implied or "presumed" consent. *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 7991, 2015 WL 4387780, at *20, ¶ 52 (FCC, 2015).

47.     The FCC has declared that "[p]urporting to obtain consent during the call... does not constitute the *prior* consent necessary to deliver the message in the first place as the request... is part of the telemarketing." *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14019, 2003 WL 21517853, at *49, ¶ 142 (2003) [Emphasis as in original].

48.     The TCPA places no affirmative obligation on a called party to opt out of calls to which he or she never consented; the TCPA places responsibility on the

caller alone to ensure that he or she has valid consent for each call made. *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8004, 2015 WL 4387780, at *29, ¶ 81 (2015).

49.     The FCC has clarified that sellers may be held vicariously liable for violations of the TCPA by third-party telemarketers that initiate calls to market the seller's products or services, declaring as follows:

> "[A] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call."

*In re Rules and Regulations Implementing the TCPA, Request of State Farm Mut. Auto. Ins. Co. for Clarification & Declaratory Ruling*, 20 FCC Rcd. 13664, 13667, 2005 WL 1981564, at *3, ¶ 7 (2005).

50.     A seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification. *In re Dish Network,* 28 FCC Rcd. 6574, 6584, 2013 WL 1934349, at *9, ¶ 28 (2013).

51.     Pursuant to 47 U.S.C. § 217, the act, omission, or failure of any officer, agent, or other person acting for or employed by a common carrier or user, acting within the scope of his employment, shall in every case also be deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

52.     When considering individual corporate officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA.  *See*, *e.g.*, *Jackson Five Star Catering, Inc. v. Beason,* No. 10-10010, 2013 WL 5966340, *4 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute.") (internal citation omitted); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D.MD. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

53.     It is well settled under Michigan law that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation. *Joy Management Co. v. City of Detroit*, 183 Mich.App. 334, 455 N.W.2d 55, 58 (1990). A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent for the corporation and not on his own behalf. *Attorney General v. Ankersen*, 148 Mich.App. 524, 557, 385 N.W.2d 658 (1986).

54.     For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of invasion of privacy and intrusion on Plaintiff's right of seclusion.

55.     For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of the occupation of the telephone line by unwelcome calls, making the phone unavailable for legitimate callers or outgoing calls, including emergency calls, when the telephone line was seized by Defendants' calls.

56.     For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff.  For calls that were answered, Plaintiff was put to the unnecessary trouble of answering them.  Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls.  This also impaired the usefulness of these features on Plaintiff's  telephone, which features are designed to inform the user of important missed communications.

57.     Each and every call placed without consent by Defendants alleged herein to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

58.     For purposes of the TCPA, the FCC has defined "willfully or knowingly"

to mean that the violator knew that he was doing the act in question, in this case, initiating a telephone solicitation, irrespective of any intent to violate the law. A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance.

## THE CALLS

### Call 1

59.    On August 26, 2025, at approximately 1:44 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's Number.

60.    The caller identification number displayed was 586-690-4658, with no caller identification name information.

61.    Upon answering the incoming call by saying "hello," Plaintiff heard a click sound, followed by approximately 3 seconds of silence, followed by a male voice saying "Hello, my name is Jason. I was calling about your property, if you are interested in selling." Jason did not identify with any company name.

62.    Plaintiff asked what company Jason worked for; Jason responded that he was a real estate agent and that he was "cold calling" to find people interested in selling their property.

63.    Plaintiff again asked what company Jason worked for; Jason then responded that he works alone and that he "puts ads up on Google for people to make

offers on property."

64.     Plaintiff asked Jason for a callback number; Jason attempted to dodge the question.  Plaintiff asked again; Jason provided a telephone number of 404-738-0748.

65.     Jason stated that Plaintiff "will be hearing from someone regarding your property."

66.     At no time during the call did Plaintiff disclose Plaintiff's Number.

67.     Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (586-690-4658) to make a do-not-call request.  The dialed number merely rang.

68.     Plaintiff dialed the callback number Jason provided (404-738-0748) to make a do-not-call request.  The dialed number merely rang.

**Call 2**

69.     On September 16, 2025, at approximately 4:04 P.M., Defendants agent initiated a telephone call to Plaintiff's Number.

70.     The caller identification number displayed was 313-351-5097, with no caller identification name information.

71.     Upon answering the incoming call by saying "hello," Plaintiff noted approximately 3-4 seconds of silence followed by a male voice stating "Is this Mark?

16

This is Wahab.  You spoke to my assistant, Jason, a few days ago about your interest in selling your property at *** S**** V****** W** in Canton."

72.    Plaintiff would later learn that "Wahab" is Defendant Wahab Virk.

73.    Virk explained that his service was to buy homes, with a quick closing, saving the seller from paying commissions to real estate brokers, and that his service handles all closing costs and transfer fees, and "everything like that."

74.    At no time during the call did Plaintiff disclose Plaintiff's Number.

75.    Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (313-351-5097) to make a do-not-call request.  The dialed number was answered by a recorded message stating "Hello, please state your name after the tone, and Google Voice will try to connect you."  Plaintiff stated his name, the line rang 5 times and then went to a recording stating "The Google Voice subscriber you are trying to reach is not available" and terminated.  Thus, Plaintiff could not meaningfully make a "do not call" demand.

## Call 3

76.    On September 16, 2025, at approximately 6:26 P.M., Defendants initiated a telephone call to Plaintiff's Number.

77.    The caller identification number displayed was 313-351-5097, with no caller identification name information.

17

78.     Upon answering the incoming call by saying "hello," Plaintiff noted approximately 3-4 seconds of silence followed by a male voice stating "Hello Mark? Wahab."

79.     Virk stated that he was going to email a contract to Plaintiff to review.

80.     At no time during the call did Plaintiff disclose Plaintiff's Number.

81.     Plaintiff never requested that Defendants call him back, never requested that Defendants send him any contract or agreement, never requested that Defendants transmit any documents by email or DocuSign, and never consented to further follow-up communications by telephone call, text message, or otherwise.

82.     Shortly thereafter, Plaintiff received a contract via Docusign from Wahab Virk.  Plaintiff did not sign or return the contract.

## Call 4

83.     On September 16, 2025, at approximately 7:19 P.M., Defendants sent an SMS text message to Plaintiff's Number.

84.     The caller identification number display was 313-351-5097, with no caller identification name information.

85.     The SMS text message read:

> "Hi Mark, just sent over the agreement. Let
> me know if you got it. Also can you please

> send me pictures of the property, inside and
> out"

86.   Plaintiff did not respond to the text message.

## Call 5

87.   On September 18, 2025, at approximately 4:14 P.M., Defendants sent an SMS text message to Plaintiff's Number.

88.   The caller identification number display was 313-351-5097, with no caller identification name information.

89.   The SMS text message read:

> "Hey Mark, Since both of you need to sign
> the agreement, DocuSign requires a separate
> email for each signed. It doesn't matter if you
> both check the same inbox - it just needs two
> different addresses so the system can give you
> each your own signature spot. I would have to
> resent the agreement. Does your wife have an
> email?"

90.   Plaintiff did not respond to the text message.

## Call 6

91.   On September 19, 2025, at approximately 2:11 P.M., Defendants sent an SMS text message to Plaintiff's Number.

92.   The caller identification number display was 313-351-5097, with no caller identification name information.

93. The SMS text message read: "Yes".

94. Plaintiff did not respond to the text message.

## Call 7

95. On September 20, 2025, at approximately 6:47 P.M., Defendants sent an SMS text message to Plaintiff's Number.

96. The caller identification number display was 313-351-5097, with no caller identification name information.

97. The SMS text message read:

> "Hey Mark, haven't gotten the agreement back from you guys. If you have any questions please let me know."

98. Plaintiff did not respond to the text message.

## Call 8

99. On September 28, 2025, at approximately 1:02 P.M., Defendants sent an SMS text message to Plaintiff's Number.

100. The caller identification number display was 313-351-5097, with no caller identification name information.

101. The SMS text message read:

> "Hey Mark, if you're still not sure about selling the property or if you have concern about the price, we can talk about it. Or if you don't want to sell it right now, please let me

20

know."

102. Plaintiff did not respond to the text message.

103. At no time during any of the calls alleged herein did Plaintiff disclose Plaintiff's Number to Defendants, request a callback, request continued follow-up, request text messages, or otherwise consent to continued contact by telephone call or SMS text message. Plaintiff did not respond to any of the text messages alleged in Calls 4 through 8. Defendants' later calls and texts were therefore unilateral follow-up solicitations, not responses to any request, invitation, or consent by Plaintiff.

## Post-Call Investigation

104. Subsequent to Call 8, Plaintiff initiated an investigative call to Virk and confronted Virk receiving unwanted telephone solicitation calls.

105. Virk explained that "Jason" was one of several third-party telemarketers hired by Virk to make cold calls and provide leads to Virk.

106. Virk explained that he uses a third-party platform to send automated SMS text messages to prompt prospects.

107. Virk knew about the "do-not-call" regulations and admitted that his cold callers called telephone numbers appearing on the Do Not Call Registry.

108. Virk explained that he had previously stopped calling Plaintiff because

21

he had learned that Plaintiff's Number appears on the Do-Not-Call Registry.

109. The repeated pattern of connection delay alleged herein—including the click sound and several seconds of dead air before a live person came on the line in Call 1, and several seconds of dead air before Virk came on the line in Calls 2 and 3—reasonably evidences that Defendants' calls were not manually dialed one-off calls, but instead were initiated, connected, screened, and/or routed through automated telephone dialing or call-distribution equipment. This pattern, coupled with Virk's admission that he used a third-party platform to send automated SMS text messages, further evidences the use of an automatic telephone dialing system and related automated telemarketing technology in the telemarketing campaign alleged herein.

110. Upon information and belief, VPS is not, and at no time relevant hereto was, licensed by the State of Michigan, Department of Licensing and Regulatory Affairs, as a real estate broker.

111. Upon information and belief, Virk is not, and at no time relevant hereto was, licensed by the State of Michigan, Department of Licensing and Regulatory Affairs, as a real estate broker or salesperson.

## COUNT I
### TCPA - 47 C.F.R.  § 64.1200(a)(1)(iii)

112. Plaintiff incorporates by reference the allegations contained in

22

Paragraphs 1 through 111 as though fully restated herein.

113. Each of Calls 1 through 8 violated 47 C.F.R. § 64.1200(a)(1)(iii) as Defendants or Defendants' agents placed non-emergency calls to Plaintiff's Number, which is a telephone number assigned to a cellular telephone service, using an ATDS without Plaintiff's prior express consent.

114. Defendants' violations were willful and/or knowing.

## COUNT II
## TCPA - 47 C.F.R. § 64.1200(a)(2)

115. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 111 as though fully restated herein.

116. Each of Calls 1 through 8 violated 47 C.F.R. § 64.1200(a)(2) as Defendants or Defendants' agents initiated telemarketing calls using an ATDS to a telephone number assigned to a cellular telephone service without prior express written consent of the called party.

117. Defendants' violations were willful and/or knowing.

## COUNT III
## TCPA - 47 C.F.R. § 64.1200(c)(2)

118. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 111 as though fully restated herein.

119. Each of Calls 1 through 8 violated 47 C.F.R. § 64.1200(c)(2) as Defendants or Defendants' agents initiated calls to a residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry

23

of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

120.   Defendants' violations were willful and/or knowing.

## COUNT IV
## TCPA - 47 C.F.R. § 64.1200(d)(4)

121.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 111 as though fully restated herein.

122.   Each of Calls 1 through 8 violated 47 C.F.R. § 64.1200(d)(4), because Defendants or Defendants' agents initiated calls for telemarketing purposes and failed to provide Plaintiff with one or more of the disclosures required by the rule, including the name of the individual caller, the name of the person or entity on whose behalf the call was being made, and a valid telephone number or address at which such person or entity could be contacted.

123.   Defendants' violations were willful and/or knowing.

## COUNT V
## TCPA - 47 C.F.R. § 64.1601(e)

124.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 111 as though fully restated herein.

125.   Each of Calls 1 through 8 violated 47 C.F.R. § 64.1601(e), because Defendants or Defendants' agents, while engaging in telemarketing, transmitted caller-identification information that was incomplete, non-identifying, misleading, and non-compliant, including by transmitting no caller-identification name

information and by transmitting telephone numbers that did not permit Plaintiff to make a do-not-call request during regular business hours.

126. Defendants' violations were willful and/or knowing.

## COUNT VI
## MHSSA - M.C.L. § 445.111a(5)

127. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 111 as though fully restated herein.

128. Each of Calls 1 through 8 violated M.C.L. § 445.111a(5), as Defendants or Defendants' agent made telephone solicitations to a residential telephone subscriber whose name and residential telephone number is on the then-current version of the federal do-not-call list.

## COUNT VII
## MTCCCA - M.C.L. § 484.125(2)(a)

129. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 111 as though fully restated herein.

130. Each of Calls 4 through 8 violated M.C.L. § 484.125(2)(a), as Defendants or Defendants' agent  used a telephone line to contact Plaintiff at Plaintiff's Number to deliver  recorded messages for the purpose of presenting commercial advertising without the subscriber having requested, consented, permitted, or authorized the contact.

## PRAYER FOR RELIEF

WHEREFORE, the aforesaid premises considered, Plaintiff prays that this Court enter a judgment for Plaintiff and against the Defendants, and each of them jointly and severally, as follows:

A.  Damages:

    i.  Statutory damages, pursuant to 47 U.S.C. § 227(b)(3), for violations of the TCPA alleged, as follows:

| Count | Violations |
|-------|-----------|
| I | 8 |
| II | 8 |

A total of 16 violations at $500.00 per violation, for damages of $8,000.00, which amount shall be trebled because the violations were willful and/or knowing, for total damages of $24,000.00.

    ii.  Statutory damages, pursuant to 47 U.S.C. § 227(c)(5), for violations of the TCPA alleged, as follows:

| Count | Violations |
|-------|-----------|
| III | 8 |
| IV | 8 |
| V | 8 |

A total of 24 violations at $500.00 per violation, for damages of $12,000.00, which amount shall be trebled because the violations were willful and/or knowing, for total damages of $36,000.00.

iii.    Statutory damages, pursuant to M.C.L. § 445.111c(3), for violations of the MHSSA alleged at Count VI: 8 violations at $250.00 per violation, for damages of $2,000.00;

iv.    Statutory damages, pursuant to M.C.L. § 484.125(5), for violations of the MTCCCA alleged at Count VII: 5 violations at $1,000.00 per violation, for damages of $5,000.00;

The cumulative total amount of damages claimed in this action (exclusive of additional calls and violations to be ascertained during discovery) is $67,000.00, and in the event of default judgment is the sum certain damages amount that will be sought.

B.  An award of Plaintiff's taxable costs and disbursements incurred in the filing and prosecution of this action;

C.  An injunction enjoining Defendants and/or Defendants' agents from initiating any telephone calls to Plaintiff's telephone numbers.

D.  Interest accruing from the date of filing until paid at the statutory rate; and,

E.  Such other and further relief as this Court deems necessary, reasonable, prudent and proper under the circumstances.

Respectfully submitted,

Dated: April 13, 2026

_____

Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
Telephone: (734) 641-2300
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*